**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LISA CAMACHO, FREDY VIVAR, and STEVEN VALCOURT, individually and on behalf of all other persons similarly situated, <br><br><div align="center">*Plaintiffs*,</div><br>-against-<br><br>JM WIRELESS LLC, <br><div align="center">*Defendant*.</div> | **CLASS AND COLLECTIVE ACTION COMPLAINT** |

<div align="center"><b>PRELIMINARY STATEMENTS</b></div>

1.    Plaintiffs Lisa Camacho ("Plaintiff Camacho"), Fredy Vivar ("Plaintiff Vivar"), and Steven Valcourt ("Plaintiff Valcourt") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, bring this action against Defendant JM Wireless LLC ("JM Wireless" or "Defendant") for unpaid overtime wages (including failure to calculate the overtime premium rate by factoring in non-discretionary commissions earned per predetermined formula), unpaid minimum wage due to gap time violations, unlawful deductions and kickbacks, late payment of wages to manual workers, misappropriated gratuities, uniform-maintenance violations, spread-of-hours violations, statutory wage notice and wage statement violations, retaliation, denial of paid safe and sick time, retaliation for the use of safe and sick time, and violations of the New York City Fair Workweek Law.

2.    Defendant operates a chain of retail mobile-telephone stores under the "Metro by T-Mobile" banner. Upon information and belief, Defendant operates approximately sixty (60) to seventy (70) Metro by T-Mobile stores, including the store located at 158-160 West 125th Street, New York, New York 10027 (the "West 125th Store"), where Plaintiffs worked.

3.      This is a hybrid action brought (i) as a collective action under Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of Plaintiffs and all similarly situated current and former hourly retail employees of JM Wireless, and (ii) as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of Plaintiffs and all similarly situated current and former hourly retail employees of JM Wireless who worked in New York within the applicable limitations period, asserting violations of the New York Labor Law ("NYLL"), the regulations promulgated thereunder, and applicable New York City law.

4.      Plaintiffs allege that Defendant maintained common payroll, timekeeping, scheduling, commission, uniform, expense, and wage-statement policies applicable to hourly retail employees at the West 125th Store and, upon information and belief, at other JM Wireless retail locations.

5.      Defendant failed to pay Plaintiffs and other hourly retail employees all overtime wages owed. Defendant understated compensable time, failed to compensate work performed before clock-in, after clock-out, during interrupted meal breaks, and after scheduled closing, and failed to include non-discretionary commissions in the regular rate used to calculate overtime premiums.

6.      Defendant also required hourly retail employees to bear business expenses and customer-account costs for Defendant's benefit, including by requiring or pressuring sales representatives to pay customer account balances or charges out of pocket when customers complained about unauthorized or misleadingly-described charges.

7.      Defendant required hourly retail employees to wear Metro by T-Mobile branded shirts and required clothing of specified colors, including dark jeans and sneakers, but did not

pay required uniform-maintenance allowances or reimburse employees for uniform-related expenses.

8.      Defendant required Plaintiffs and similarly situated employees to work shifts and workdays exceeding ten (10) hours from the beginning to the end of the workday without paying spread-of-hours premiums required by New York law.

9.      Defendant paid Plaintiffs and similarly situated employees on a bi-weekly basis even though Plaintiffs and similarly situated employees performed substantial manual work as part of their retail positions, including opening, closing, cleaning, stocking, inventory, cash counts, bank deposits, and physical handling of devices, accessories, displays, and store materials.

10.     Defendant also unlawfully retained customer gratuities received by Plaintiff Camacho by directing her and other hourly retail employees to scan customer tips into the point-of-sale system as if they were accessory sales and to place the cash in the store register, where Defendant retained the funds.

11.     After Plaintiff Camacho complained internally about missing wages, unpaid overtime, tip retention, denial of sick time, and false accusations of theft, Defendant retaliated against her by reducing her schedule, changing her shifts, falsely accusing her of misconduct, refusing to investigate her complaints, contesting her unemployment claim, and terminating her employment.

12.     After Plaintiff Vivar complained internally about unpaid overtime, time edits, commissions, understaffing, customer-account charges, and unsafe working conditions, Defendant failed to correct the violations, reduced his hours, threatened him with loss of employment, and made working conditions intolerable, leading him to resign.

13.    Plaintiffs seek declaratory relief, unpaid wages, liquidated damages, statutory damages, compensatory and punitive damages, prejudgment interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

15.    This Court has supplemental jurisdiction over Plaintiffs' state and municipal law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District, including Plaintiffs' work at the West 125th Store located at 158-160 West 125th Street, New York, New York 10027, in New York County.

17.    This Court has personal jurisdiction over Defendant because Defendant transacts business in the State of New York and within this District, operates retail locations in this District, employs workers in this District, and the claims asserted herein arise out of and relate to that business and employment.

18.    At all relevant times, Defendant was an enterprise engaged in commerce within the meaning of the FLSA because it had employees engaged in commerce or handling, selling, or otherwise working on goods or materials that had moved in interstate commerce, and because Defendant's annual gross volume of sales made or business done was not less than five hundred thousand dollars ($500,000).

**<u>PARTIES</u>**

*Plaintiffs*

19.    Plaintiff Lisa Camacho is an adult individual residing in New York County, New York. Plaintiff Camacho was employed by Defendant as an hourly retail sales employee at the West 125th Store from in or about June 2025 through November 7, 2025.

20.    Plaintiff Fredy Vivar is an adult individual residing in Queens County, New York. Plaintiff Vivar was employed by Defendant as an hourly retail sales employee at the West 125th Store from July 8, 2024 through May 3, 2025, and again from May 19, 2025 through October 11, 2025.

21.    Plaintiff Steven Valcourt is an adult individual residing in Kings County, New York. Plaintiff Valcourt was employed by Defendant as an hourly retail sales employee at the West 125th Store from January 16, 2024 through August 2, 2024.

*Defendant*

22.    Defendant JM Wireless LLC is, upon information and belief, a Delaware limited liability company with a principal place of business at 175 South Bloomingdale Road, Bloomingdale, Illinois 60108. Defendant's federal employer identification number is 87-2784411.

23.    Upon information and belief, Defendant is authorized to do business in New York, operates Metro by T-Mobile retail locations in New York City and elsewhere, and at all relevant times employed twenty (20) or more retail employees in New York City. Specifically, They have 11 stores in New York, all in the NYC metro area: Brooklyn (3): Broadway/Williamsburg, Flatbush Ave, Kings Plaza; Bronx (2): Fordham Rd, Third Ave; Manhattan (2): Lexington Ave (East Harlem), West 125th St (Harlem); Queens (2): Jamaica Ave,

Roosevelt Ave (Jackson Heights); Staten Island (1): Forest Ave; and Long Island (1): Old Country Road, Westbury.

24.     At all relevant times, Defendant was Plaintiffs' "employer" within the meaning of the FLSA, the NYLL, the New York City Earned Safe and Sick Time Act ("ESSTA"), and the New York City Fair Workweek Law.

25.     At all relevant times, Defendant exercised control over Plaintiffs' and similarly situated employees' employment, including hiring, firing, scheduling, timekeeping, payroll, wages, commissions, discipline, store assignments, uniform requirements, customer-account policies, and the maintenance of employee records.

## FACTUAL ALLEGATIONS

### A.     *Defendant's Retail Business and Common Employment Practices*

26.     Defendant operates retail stores that sell mobile phones, wireless service plans, accessories, home internet products, upgrades, activations, and related wireless products and services to the public.

27.     Plaintiffs and similarly situated hourly retail employees worked in Defendant's retail stores as sales representatives, retail sales representatives, keyholders, and related hourly retail positions.

28.     Defendant centrally controlled payroll and timekeeping. Plaintiffs' wage statements identify JM Wireless LLC as the employer, list the same Bloomingdale, Illinois business address, identify the same company telephone number, and were issued through a common payroll system.

29.    Defendant required hourly retail employees to clock in and out through Defendant's timekeeping system, including through a point-of-sale or store-based timekeeping system, and Defendant's managers had the ability to edit employee time records.

30.    Defendant paid hourly retail employees by direct deposit or check and issued wage statements reflecting hourly rates, regular hours, overtime hours, commissions, tax deductions, and other pay codes.

31.    Defendant scheduled hourly retail employees using store schedules posted or circulated shortly before the workweek, and managers changed schedules, added shifts, removed shifts, required employees to report on short notice, and required employees to work closing or extended shifts without written consent or premium compensation.

32.    Defendant required hourly retail employees to meet sales goals, accessory goals, activation goals, upgrade goals, and commission metrics, and Defendant tied employees' continued employment, scheduling, and discipline to their sales and commission performance.

33.    Defendant required hourly retail employees to wear uniforms or uniform-like clothing, including Metro by T-Mobile branded shirts and required pants or jeans of specified colors, while performing retail sales work.

34.    Defendant required hourly retail employees to be fully in uniform while working and, upon information and belief, required employees to clock in only after they were properly dressed and ready to work.

**B.    *Plaintiff Camacho's Employment***

35.    Plaintiff Camacho worked as a retail sales employee at 158-160 West 125th Street, New York, New York, for approximately nine (9) years, including under prior store

owners that operated under names including, without limitation, Portable Toys, Stellar, Elite, and Choice. JM Wireless assumed ownership and operation of the West 125th Store in or about 2025.

36.     Plaintiff Camacho was employed by JM Wireless from in or about June 2025 through November 7, 2025.

37.     Plaintiff Camacho's primary duties consisted of selling mobile telephone equipment, accessories, and wireless service plans to retail customers at the West 125th Store.

38.     Plaintiff Camacho's payroll records reflect an hourly rate of eighteen dollars and fifty cents ($18.50) throughout her employment with JM Wireless.

39.     Plaintiff Camacho was also paid non-discretionary commissions pursuant to a pre-set, formulaic compensation plan based on the volume and type of products and services she sold.

40.     Plaintiff Camacho clocked in and out of her work shifts using a fingerprint-based time clock at the West 125th Store. Defendant therefore had records of Plaintiff Camacho's hours worked.

41.     Early in Plaintiff Camacho's employment with JM Wireless, Plaintiff Camacho was scheduled and worked approximately ten (10) to eleven (11) hours per day, and in certain workweeks worked between approximately eighty-six (86) and one hundred ten (110) hours per week.

42.     Defendant required Plaintiff Camacho to wear a Metro by T-Mobile uniform or uniform-like clothing, including black Metro by T-Mobile shirts.

43.     Defendant did not provide Plaintiff Camacho with uniform-maintenance pay or reimbursement.

44.    Defendant did not permit hourly retail employees, including Plaintiff Camacho, to take bona fide meal breaks. Although meal breaks were nominally thirty (30) minutes long, Defendant prohibited employees from going to the back room of the store to eat, required employees to remain available to customers, and required employees to serve customers throughout purported break periods.

45.    On or about a Sunday in August 2025, Plaintiff Camacho was required by Defendant to come into the West 125th Store to train a newly hired sales representative. Defendant did not pay Plaintiff Camacho for that work.

46.    Following Plaintiff Camacho's internal complaints described herein, Defendant reduced Plaintiff Camacho's schedule in or about August 2025.

### C.    *Plaintiff Vivar's Employment*

47.    Plaintiff Vivar worked for JM Wireless LLC at the West 125th Store.

48.    Plaintiff Vivar was hired as a sales representative. Plaintiff Vivar was never promoted to a managerial position.

49.    Within approximately two (2) weeks of his start date, Defendant entrusted Plaintiff Vivar with store keys because he reliably arrived early. Defendant thereafter required him to perform additional duties without additional compensation, including opening the store, closing the store, inventory, opening and closing cash counts, bank deposits, receiving inventory, handling merchandise, cleaning, and other back-office work.

50.    Plaintiff Vivar did not hire employees, fire employees, discipline employees, set schedules, or exercise managerial discretion over matters of significance.

51.    Plaintiff Vivar's regular duties were primarily retail sales, customer service, physical store work, inventory, stocking, cleaning, opening, closing, and other labor in furtherance of Defendant's business.

52.    Plaintiff Vivar's initial hourly rate was seventeen dollars ($17.00) per hour. After he was rehired in May 2025, his hourly rate was, upon information and belief, eighteen dollars and fifty cents ($18.50) per hour.

53.    During portions of his employment, Plaintiff Vivar's regular schedule included shifts such as Monday through Thursday from approximately 12:00 p.m. to 8:00 p.m. and Saturday from approximately 9:00 a.m. to 4:00 p.m.

54.    During other portions of his employment, Plaintiff Vivar worked approximately six (6) days per week, including opening-to-closing shifts and shifts caused by understaffing, absent employees, and management requests that he report on short notice to open or cover the store.

55.    Plaintiff Vivar also worked additional off-the-clock time after closing, including cleaning, counting money, completing closing tasks, and making or preparing deposits. Plaintiff Vivar estimates that he performed approximately one (1) to two (2) hours per day of such off-the-clock work on affected days.

56.    Plaintiff Vivar's meal breaks were often interrupted. When the store was busy or customers needed assistance, Plaintiff Vivar was required to return to work during his purported thirty-minute meal break.

57.    Plaintiff Vivar regularly worked more than forty (40) hours in a workweek, but Defendant did not pay him for all overtime hours actually worked.

58.     For example, for the pay period July 28, 2024 through August 10, 2024, Defendant's wage statement paid Plaintiff Vivar for seventy-nine and one-half (79.50) regular hours and only one and thirteen one-hundredths (1.13) overtime hours, even though Plaintiff Vivar contends that he worked substantially more overtime because he worked opening and closing schedules.

59.     Plaintiff Vivar complained that he worked substantial overtime that was not paid. Defendant responded, in substance, that it did not pay a lot of overtime and did not correct the missing hours.

60.     Plaintiff Vivar used Defendant's point-of-sale or store-based system to clock in and out. Upon information and belief, managers could edit his time records, and Plaintiff Vivar believes that managers edited time records to reduce overtime hours.

61.     Plaintiff Vivar earned non-discretionary commissions. His commission structure included approximately fixed amounts set by Defendant per activation and per accessory sold.

62.     Defendant paid Plaintiff Vivar's commissions separately from certain hourly wage checks and did not include commissions when calculating his overtime rate.

63.     Defendant required Plaintiff Vivar to pay customer account balances and charges out of pocket when customers complained that products or services had been added or promoted as free but were later charged to the customer. Plaintiff Vivar paid such charges by debit card, including payments of twenty-eight dollars and eighty-three cents ($28.83) on December 27, 2024, thirty dollars and eighty-eight cents ($30.88) on November 22, 2024, ten dollars and eighty-nine cents ($10.89) on August 29, 2024, and twenty-eight dollars and eighty-three cents ($28.83) on August 29, 2024.

64.     Defendant did not reimburse Plaintiff Vivar for those customer-account payments.

65. Defendant required Plaintiff Vivar to wear a Metro by T-Mobile uniform or uniform-like clothing, including black Metro by T-Mobile shirts.

66. Defendant did not provide Plaintiff Vivar with uniform-maintenance pay or reimbursement.

67. Plaintiff Vivar worked shifts and workdays exceeding ten (10) hours from the beginning to the end of the workday. By way of example, Plaintiff Vivar reports a week in which he worked shifts such as 8:00 a.m. to 8:45 p.m. and 9:00 a.m. to 8:45 p.m., and another week in which he worked shifts such as 9:00 a.m. to 8:45 p.m. and 11:00 a.m. to 8:45 p.m. Defendant did not pay him spread-of-hours premiums.  On these shifts, his daily take home pay fell below the minimum wage for all hours worked plus spread of hours pay. Separately, his weekly take home pay, fell below the minimum due for minimum wage for straight time hours, overtime pay for overtime hours, plus uniform maintenance and spread of hours pay based on hours worked.

68. Plaintiff Vivar complained to managers about safety, understaffing, unpaid overtime, time edits, schedule issues, commissions, customer-account payments, and the store's policy prohibiting tips.

69. Plaintiff Vivar complained that Defendant required him to stay late as a closer and were not paying for all of the hours, and his manager told him, in substance, that staying late was his job.

70. Plaintiff Vivar complained about being required to cover customer-account balances causing his take home wages to suffer, and his manager told him, in substance, that Defendant would not do anything about it.

71.     After Plaintiff Vivar complained, Defendant reduced his work from approximately five (5) working days per week to approximately four (4) or three (3) working days per week toward the end of his employment.

72.     On or about September 9, 2025, Plaintiff Vivar texted a manager named Raymond that he did not feel safe at the West 125th Store, that the store was understaffed, that the stress and overwork were affecting his medical condition, and that he needed a transfer. Raymond responded that Plaintiff Vivar was scheduled to open, that he was the only person with keys, and that he was required to show up on time until new hires were onboarded.

73.     On or about October 8, 2025, Plaintiff Vivar asked Raymond whether he would be alone for the rest of the day because the only other employee was a new hire still in training. Raymond responded that the other employee would be on the sales floor and that Raymond would handle the lack of a POS key.

74.     On October 11, 2025, Plaintiff Vivar resigned by written text message, stating that as of October 11, 2025, he resigned from his position at JM Wireless.

75.     Plaintiff Vivar resigned because Defendant did not correct the wage violations, required him to continue working under unsafe and understaffed conditions, reduced his hours after he complained, and made conditions intolerable by continuing to require overtime and off-the-clock work without proper pay.

**D.      *Plaintiff Valcourt's Employment***

76.     Plaintiff Valcourt worked for JM Wireless LLC at the West 125th Store only.

77.     Plaintiff Valcourt was hired by Jason Diaz and was employed from January 16, 2024 through August 2, 2024.

78. Plaintiff Valcourt was paid seventeen dollars ($17.00) per hour by direct deposit on a bi-weekly basis.

79. Plaintiff Valcourt worked as a retail sales employee and, for approximately two (2) to three (3) months before his termination

80. Plaintiff Valcourt's duties included assisting customers with phone issues, selling phones, accessories, lines, upgrades, activations, and home internet, cleaning the store, opening and closing tasks, handling cash, performing inventory, making deposits, performing back-office work, and making customer account changes.

81. Plaintiff Valcourt had no authority to hire, fire, discipline, or set schedules for employees, and did not exercise managerial discretion over matters of significance.

82. Plaintiff Valcourt's shifts varied. He often worked shifts such as 3:30 p.m. to 9:00 p.m., and also worked shifts such as 9:00 a.m. to 5:00 p.m., 10:00 a.m. to 6:00 p.m., 7:00 a.m. to 3:00 p.m., and similar schedules. He typically worked five (5) days per week and sometimes worked six (6) days per week when extra staff was needed.

83. Plaintiff Valcourt usually received a thirty-minute meal break on longer shifts, but did not receive a meal break for 3:30 p.m. to 9:00 p.m. shifts.

84. Plaintiff Valcourt worked more than forty (40) hours in at least the pay period June 30, 2024 through July 13, 2024. Defendant paid him three (3.00) overtime hours at twenty-five dollars and fifty cents ($25.50) per hour, exactly one and one-half (1.5) times his base hourly rate of seventeen dollars ($17.00), without including commissions in the regular rate.

85. Plaintiff Valcourt's paystub for June 16, 2024 through June 29, 2024 likewise reflects seventy-nine and thirty-five one-hundredths (79.35) regular hours and ninety-five

one-hundredths (0.95) overtime hours paid at twenty-five dollars and fifty cents ($25.50), while also reflecting year-to-date commission earnings.

86.     Plaintiff Valcourt earned non-discretionary commissions based on sales of phones, accessories, added lines, and home internet.

87.     Defendant did not include Plaintiff Valcourt's commissions in the overtime rate used to pay him for overtime hours.

88.     Plaintiff Valcourt was required by Jason to pay out of pocket for customer account balances or customer billing issues approximately three (3) to four (4) times. Customers complained that their bills were too high or that items, lines, or accessories were added to their accounts without permission. Plaintiff Valcourt paid approximately three dollars ($3.00) to four dollars ($4.00) in cash on each such occasion and was not reimbursed.

89.     Plaintiff Valcourt worked at least one shift or workday exceeding ten (10) hours from beginning to end. On that occasion, he was scheduled for 12:00 p.m. to 8:00 p.m., was asked by Jason to report at 10:00 a.m., and ended his shift after 9:00 p.m. Defendant did not pay him a spread-of-hours premium. On these shifts, his daily take home pay fell below the minimum wage for all hours worked plus spread of hours pay. Separately, his weekly take home pay, fell below the minimum due for minimum wage for straight time hours, overtime pay for overtime hours, plus uniform maintenance and spread of hours pay based on hours worked.

90.     Plaintiff Valcourt was required to wear shirts with the company logo when at work.

91.     Defendant did not pay him uniform-maintenance pay or reimburse him for these costs.

92.     Plaintiff Valcourt did not receive a compliant wage notice, offer letter, handbook, arbitration agreement, commission plan, or policy acknowledgment at hire, upon information and belief.

**E.      *Defendant's Failure to Pay All Overtime Wages and All Compensable Time***

93.     At all relevant times, Defendant maintained a uniform policy and practice of failing to pay all overtime wages owed to hourly retail employees.

94.     Defendant required Plaintiffs and similarly situated hourly retail employees to work before clock-in, after clock-out, during interrupted meal breaks, after scheduled closing, during training, and during store-opening and store-closing work without properly compensating all such time.

95.     Defendant's managers knew that hourly retail employees were working beyond scheduled shifts because managers assigned opening and closing duties, called employees in to cover shifts, directed employees to remain until customers were served, communicated with employees during and after shifts, and reviewed store schedules and payroll.

96.     Defendant's managers had the ability to edit time entries and approve payroll, and Defendant's payroll records did not accurately reflect all hours actually worked by Plaintiffs and similarly situated employees.

97.     Managers told hourly retail employees, in substance, that Defendant did not pay a lot of overtime, that staying late was part of their job, and that overtime was capped or limited regardless of hours actually worked.

98.     Defendant provided thirty minute meal breaks but employees had to remain available to customers and operations, could not leave the premises or even use the break room

for the whole 30 minutes, and did not consistently get to take the meal break within the required time window based on their shift length and start and end time.

99.    Defendant therefore had actual or constructive knowledge of the compensable work Plaintiffs and similarly situated employees performed and failed to pay them all straight-time and overtime wages owed.

**F.    *Defendant's Commission Plan & Failure to Include Commissions in the Regular Rate***

100.    At all relevant times, Defendant paid Plaintiffs and similarly situated hourly retail employees non-discretionary commissions pursuant to pre-set sales metrics and commission formulas.

101.    Plaintiffs' accounts identify commissions for activations, accessories, upgrades, phones, added lines, home internet, and other products or services sold by retail employees.

102.    Defendant's managers repeatedly communicated sales goals, commission metrics, accessory targets, upgrade targets, and activation targets to hourly retail employees, and threatened discipline, reduced opportunities, and termination if employees failed to meet those targets.

103.    Defendant's commissions were non-discretionary because they were tied to measurable sales performance, activations, accessories, upgrades, lines, and related sales metrics, and employees expected to receive them when they satisfied Defendant's stated requirements.

104.    Defendant's paystubs reflect that commissions were paid separately or in separate paystub line items from regular wages and overtime wages.

105.    When Defendant paid overtime, Defendant calculated the overtime rate as exactly one and one-half (1.5) times the employee's base hourly rate, without including non-discretionary commissions in the regular rate.

106.   For Plaintiff Vivar, paystubs reflect an hourly rate of seventeen dollars ($17.00) and an overtime rate of twenty-five dollars and fifty cents ($25.50), while also reflecting commission earnings paid separately or on other wage statements.

107.   For Plaintiff Valcourt, paystubs reflect an hourly rate of seventeen dollars ($17.00) and an overtime rate of twenty-five dollars and fifty cents ($25.50), while also reflecting commission earnings paid separately or on other wage statements.

108.   For Plaintiff Camacho, Defendant calculated overtime at twenty-seven dollars and seventy-five cents ($27.75), exactly one and one-half (1.5) times her base hourly rate of eighteen dollars and fifty cents ($18.50), without including commissions in the regular rate.

109.   Defendant's failure to include non-discretionary commissions in the regular rate caused systematic underpayment of overtime to Plaintiffs and similarly situated employees.

## G.   *Defendant's Unlawful Customer-Account Payment and Kickback Practices*

110.   At all relevant times, Defendant maintained a practice under which hourly retail employees were required or pressured to cover customer account balances, customer billing issues, unauthorized account additions, or products and services represented as free but later charged to customers. Plaintiff Vivar paid customer-account charges by debit card, including payments of twenty-eight dollars and eighty-three cents ($28.83), thirty dollars and eighty-eight cents ($30.88), ten dollars and eighty-nine cents ($10.89), and twenty-eight dollars and eighty-three cents ($28.83).

111.   When customers complained about such charges, Defendant did not absorb the cost of correcting the account, refunding the charge, or satisfying the customer. Instead, managers required or pressured hourly retail employees to pay the customer balance or charge out of pocket.

112.    Plaintiff Vivar paid customer-account charges by debit card, including payments of twenty-eight dollars and eighty-three cents ($28.83), thirty dollars and eighty-eight cents ($30.88), ten dollars and eighty-nine cents ($10.89), and twenty-eight dollars and eighty-three cents ($28.83).

113.    Plaintiff Valcourt paid customer-account charges in cash approximately three (3) to four (4) times in amounts of approximately three dollars ($3.00) to four dollars ($4.00) each.

114.    Defendant did not reimburse Plaintiffs Vivar or Valcourt for these payments.

115.    These payments were for Defendant's benefit and operated as unlawful deductions, wage kickbacks, and unreimbursed business expenses.

## H.    Uniforms and Uniform Maintenance

116.    Defendant required hourly retail employees to wear branded Metro by T-Mobile shirts and required pants or jeans of specific colors, including black, purple, blue, or dark-blue clothing depending on the item and time period.

117.    Plaintiffs Vivar and Valcourt and similarly situated employees were required to maintain these required uniforms or uniform-like clothing themselves.

118.    Defendant did not launder Plaintiffs' uniforms, did not offer laundering services, did not provide sufficient replacement clothing to avoid regular employee laundering, and did not pay required uniform-maintenance allowances or reimbursement.

119.    Plaintiffs Vivar and Valcourt paid out of pocket to launder required uniform clothing and to purchase required jeans, shoes, or related clothing needed to comply with Defendant's dress requirements.

## I.    Spread-of-Hours Violations

120.    Plaintiffs and similarly situated employees worked shifts and workdays in which the interval between the beginning and end of the workday exceeded ten (10) hours.

121.    Plaintiff Camacho worked ten (10) to eleven (11) hour days and, in some weeks, extensive hours far exceeding forty (40) hours.

122.    Plaintiff Vivar worked shifts such as 8:00 a.m. to 8:45 p.m., 9:00 a.m. to 8:45 p.m., and 11:00 a.m. to 8:45 p.m., and worked opening-to-closing shifts when Defendant was understaffed or when other employees did not report for work.

123.    Plaintiff Valcourt worked at least one shift or workday beginning at approximately 10:00 a.m. and ending after 9:00 p.m.

124.    Defendant did not pay Plaintiffs and similarly situated employees an additional one (1) hour of pay at the applicable minimum wage rate for workdays exceeding ten (10) hours from beginning to end.

125.    For these shifts, daily take home pay fell below the minimum wage for all hours worked plus spread of hours pay. Separately, weekly take home pay fell below the minimum due for minimum wage for straight time hours, overtime pay for overtime hours, plus uniform maintenance and spread of hours pay based on hours worked.

**J.      Wage Notice and Wage Statement Violations**

126.    Defendant did not provide Plaintiffs and similarly situated employees with compliant written wage notices at hire or rehire that accurately identified their rates of pay, overtime rates, allowances, regular payday, employer information, and basis of pay.

127.    Plaintiff Camacho did not sign any offer letter, employee handbook acknowledgment, arbitration agreement, or written wage notice in connection with her hire.

128.    Plaintiff Valcourt did not receive or sign a wage notice, offer letter, handbook, arbitration agreement, commission plan, confidentiality agreement, or policy acknowledgment at hire, upon information and belief.

129.    Plaintiff Vivar remembers signing a handbook or hire agreement, but he does not have access to the documents because they were sent to a work email account controlled by Defendant.

130.    Defendant's wage statements did not accurately state all hours worked, all overtime hours worked, all regular rates of pay, all overtime rates of pay, the regular rate including commissions, all allowances, all deductions, all wages earned, all commissions earned, all spread-of-hours pay owed, all uniform-maintenance pay owed, or the basis on which commissions were calculated.

131.    Defendant's wage statements were therefore inaccurate and incomplete within the meaning of NYLL § 195(3).

**K.     Late Payment of Wages to Manual Workers**

132.    Plaintiffs and similarly situated employees spent more than twenty-five percent (25%) of their working time performing physical and manual labor, including cleaning, stocking, inventory, opening, closing, handling cash, handling phones, tablets, accessories, displays, boxes, devices, and store materials, arranging merchandise, moving products, receiving inventory, preparing deposits, and physically maintaining the store.

133.    Plaintiffs Vivar and Valcourt and similarly situated employees were therefore manual workers within the meaning of NYLL § 190(4) and were required to be paid weekly pursuant to NYLL § 191(1)(a).

134.    Defendant paid Plaintiffs Vivar and Valcourt and similarly situated employees on a bi-weekly basis, including through wage statements covering approximately fourteen (14) day pay periods.

135.    Defendant's bi-weekly payment practice caused late payment of wages to Plaintiffs Vivar and Valcourt and similarly situated manual workers in violation of NYLL § 191.

**L.      Plaintiff Camacho's Gratuity Claim**

136.    Customers of the West 125th Store frequently provided Plaintiff Camacho with cash tips of approximately ten dollars ($10.00) to twenty dollars ($20.00) each, on average every other day, in recognition of services rendered.

137.    In or about June or July 2025, Raymond, acting as Defendant's district manager and agent, verbally instructed Plaintiff Camacho and other hourly retail employees to scan customer tips into Defendant's point-of-sale system as if they were accessory sales and to deposit the cash into the store register.

138.    Defendant did not return these tips to Plaintiff Camacho or to other hourly retail employees. Defendant retained the gratuities for the benefit of the company.

139.    Upon information and belief, store managers of JM Wireless were permitted to retain their own customer tips, while the tip-in-register policy was imposed on hourly retail sales employees.

140.    Plaintiff Camacho refused to surrender her tips to the register because the money belonged to her as gratuities. Defendant thereafter accused Plaintiff Camacho of stealing from the company, issued or threatened discipline, and terminated her employment.

**M.     Fair Workweek Scheduling Violations**

141.    JM Wireless is a "retail employer" within the meaning of the New York City Fair Workweek Law because it is engaged primarily in the sale of consumer goods at retail and employs twenty (20) or more retail employees in New York City.

142.    Defendant did not provide Plaintiffs and similarly situated retail employees with stable schedules or the advance written notice required by law.

143.    Plaintiff Camacho's schedule was changed on at least five (5) occasions during her six-month employment without her consent and without the required advance written notice.

144. Plaintiff Vivar reports that schedules were usually posted on Sunday with approximately one (1) day of notice before the coming workweek, that he was assigned many on-call shifts, including at least approximately one (1) full-shift on-call assignment per week, and that Defendant did not pay any premium or additional compensation for these schedule changes or on-call shifts.

145. Plaintiff Valcourt reports that schedules were posted every Saturday night, that changes occurred weekly, and that Defendant did not provide extra pay or compensation for schedule changes.

146. Defendant's schedule practices included adding shifts, changing shifts, reducing shifts, requiring on-call work, and requiring employees to work without the written consent and advance notice required by the Fair Workweek Law.

### N.    Earned Safe and Sick Time

147. Plaintiff Camacho was an "employee" and JM Wireless was an "employer" within the meaning of ESSTA at all relevant times.

148. Pursuant to N.Y.C. Admin. Code § 20-913, employees in New York City are entitled to use accrued safe and sick time after the applicable waiting period.

149. Plaintiff Camacho commenced her employment with JM Wireless in or about June 2025. Plaintiff Camacho therefore became eligible to use accrued safe and sick time on or about the beginning of October 2025.

150. On October 13, 2025, Plaintiff Camacho was unable to report to work due to illness and sought to use accrued safe and sick time. Defendant's time-off-request system blocked her request, displaying a notice that the employee's waiting period for the NYC Sick Time policy ended on Tuesday, October 14, 2025.

151.    On October 20, 2025, Plaintiff Camacho was again unable to report to work due to illness.

152.    Plaintiff Camacho was never paid any safe or sick time during her employment with JM Wireless, notwithstanding her requests, her accrued hours, and Human Resources' purported confirmation of her October 13 and October 20 sick-time requests.

**O.    Retaliation Against Plaintiff Camacho**

153.    Beginning in or about June 2025, Plaintiff Camacho complained verbally to Raymond, Ryan, and other managers regarding missing pay, including three (3) days of training that Plaintiff Camacho was not initially paid for, Defendant's refusal to pay overtime, and Defendant's policy requiring tips to be left in the register.

154.    Beginning in or about June 2025, Plaintiff Camacho complained verbally to Raymond, Ryan, and other managers regarding missing pay, including three (3) days of training that Plaintiff Camacho was not initially paid for, Defendant's refusal to pay overtime, and Defendant's policy requiring tips to be left in the register. Beginning in or about August 2025, Plaintiff Camacho complained in writing to Stephen Jackson, JM Wireless's Human Resources Business Partner for the West Region, regarding false accusations that she had taken tips or stolen money from the store safe.

155.    On or about August 10 and 11, 2025, Plaintiff Camacho complained to Human Resources by e-mail that hours were missing from her paycheck and that Raymond had not submitted her time to payroll.

156.    On or about September 9, 2025, Plaintiff Camacho complained to Human Resources that she had not been paid for September 16 and 17.

157.    On or about October 9, 2025, Plaintiff Camacho sent a detailed written complaint to Human Resources stating that she was very uncomfortable working for JM Wireless because

each time money was missing she was accused of taking it, describing harassment by Raymond, false theft accusations, management's refusal to investigate, and Defendant's failure to provide prior written warnings before threatening discipline. Plaintiff Camacho also stated that she would contact legal because the situation was ridiculous.

158. On or about October 13, 2025, Plaintiff Camacho forwarded Human Resources a series of WhatsApp messages with Raymond in which Raymond accused Plaintiff Camacho of misconduct, threatened to report her to Human Resources, and demanded that she sign a written letter of explanation regarding tips and missing register money that Plaintiff Camacho had not agreed to.

159. On or about October 15, 2025, Plaintiff Camacho e-mailed Human Resources a screenshot showing that Defendant's time-off-request system had blocked her attempt to use New York City sick time.

160. On or about October 20, 2025, Plaintiff Camacho e-mailed Human Resources again to advise that no one had responded to her sick-time inquiry and identified the dates and times for which she was seeking sick time.

161. Plaintiff Camacho also complained directly to Human Resources during webcam meetings that she was working in a hostile work environment, that Human Resources was failing to do its job, and that Human Resources was consistently taking management's side.

162. After Plaintiff Camacho complained, Defendant reduced her scheduled hours, changed her work schedule on at least five (5) occasions, accused her of theft and misconduct without basis, accused her in front of co-workers and customers, micromanaged and harassed her, refused to interview witnesses or review surveillance footage, denied sick time, and terminated her employment.

163. On November 7, 2025, Plaintiff Camacho was summoned to an in-person meeting in the back room of the West 125th Store with Raymond and Human Resources. Human Resources informed her that her employment was terminated because she had taken tips, demanded that she surrender her store keys, and did not permit her to respond to the asserted basis for termination.

164. Defendant's stated reason for terminating Plaintiff Camacho's employment was pretextual. Plaintiff Camacho did not steal from Defendant. She refused to deposit cash tips into the register because the tips belonged to her as a matter of law.

165. After Plaintiff Camacho's termination, Defendant contested her unemployment claim. Approximately three (3) months after her termination, Raymond called Plaintiff Camacho to apologize for terminating her, but Plaintiff Camacho instructed him to refrain from further contact.

**P.    Retaliation Against Plaintiff Vivar**

166. Plaintiff Vivar complained to managers and supervisors about unpaid overtime, time edits, commissions, schedule issues, customer-account payments, unsafe working conditions, understaffing, and being required to work late without proper pay.

167. Plaintiff Vivar's complaints included complaints to Jason Diaz Medina, Raymond, and other managers.

168. Defendant did not correct Plaintiff Vivar's wage complaints. Instead, managers ignored his complaints, told him they were looking into issues without taking corrective action, told him Defendant would not do anything about customer-account payments, and threatened him that he could lose his job or be accused of not reaching store quotas.

169.    After Plaintiff Vivar complained, Defendant reduced his hours, continued requiring late work and overtime without proper pay, failed to correct time edits, failed to correct commission issues, and continued requiring him to work in unsafe and understaffed conditions.

170.    Plaintiff Vivar's resignation was caused by Defendant's unlawful pay practices, Defendant's failure to correct those practices after his complaints, the reduction of his hours after complaints, and Defendant's intolerable working conditions.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

171.    Plaintiffs bring the First Cause of Action as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves and the following collective: All current and former hourly retail employees of JM Wireless LLC who worked at any JM Wireless Metro by T-Mobile retail location at any time within three (3) years prior to the filing of this Complaint through the date of judgment (the "FLSA Collective"). Plaintiffs and the FLSA Collective members are similarly situated because they performed substantially similar hourly retail duties and were subject to Defendant's common policies and practices, including failure to pay for all hours worked, manipulation or editing of time records, off-the-clock opening and closing work, interrupted meal breaks, failure to include non-discretionary commissions in the regular rate, and restrictions or caps on paid overtime. Plaintiffs request that this Court promptly authorize notice of this action to the FLSA Collective.

172.    Plaintiffs bring their NYLL and New York City law claims as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following class: All current and former hourly retail employees of JM Wireless LLC who worked in the State of New York at any time within six (6) years prior to the filing of this Complaint through the date of judgment (the "New York Class").

173.    Numerosity. The members of the New York Class and subclasses are so numerous that joinder of all members is impracticable. Upon information and belief, the West 125th Store alone employed multiple hourly retail employees at any given time, Defendant operates multiple Metro by T-Mobile retail locations in New York, and total New York Class membership is anticipated to exceed forty (40) employees during the relevant period.

174.    Commonality. There are questions of law and fact common to the New York Class and subclasses, including whether Defendant failed to pay for all hours worked, failed to pay all overtime, failed to include commissions in the regular rate, failed to pay weekly wages to manual workers, failed to reimburse uniform expenses, failed to pay uniform-maintenance allowances, failed to pay spread-of-hours premiums, required unlawful deductions or kickbacks, retained gratuities, failed to provide compliant wage notices and wage statements, and violated the Fair Workweek Law.

175.    Typicality. Plaintiffs' claims are typical of the claims of the New York Class and subclasses because Plaintiffs, like class members, were hourly retail employees subjected to Defendant's common policies and practices and suffered the same types of wage and statutory injuries.

176.    Adequacy. Plaintiffs will fairly and adequately protect the interests of the New York Class and subclasses. Plaintiffs have retained counsel competent and experienced in wage-and-hour class and collective action litigation. Plaintiffs have no interests antagonistic to those of the New York Class or subclasses.

177.    Predominance and Superiority. The questions of law and fact common to the New York Class and subclasses predominate over any questions affecting only individual class

members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

178. Class treatment is appropriate because Defendant's payroll, timekeeping, wage-statement, commission, uniform, scheduling, and expense policies were common, centrally controlled, and capable of classwide proof through Defendant's records, policies, communications, payroll data, schedules, wage statements, and testimony.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Failure to Pay Overtime Wages - FLSA, 29 U.S.C. §§ 201 et seq.**

179. Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

180. At all relevant times, Plaintiffs and the members of the FLSA Collective were Defendant's "employees" within the meaning of 29 U.S.C. § 203(e).

181. Plaintiffs and members of the FLSA Collective regularly worked more than forty (40) hours in individual workweeks.

182. Defendant violated the FLSA, 29 U.S.C. § 207, by failing to pay overtime compensation at one and one-half (1.5) times the regular rate of pay for all hours worked over forty (40) in a workweek, including by failing to pay for all compensable time and by failing to include non-discretionary commissions in the regular rate used to calculate the overtime premium.

183. Defendant's violations of the FLSA were willful within the meaning of 29 U.S.C. § 255(a).

184.    Plaintiffs and the FLSA Collective are entitled to recover unpaid overtime compensation, an equal amount as liquidated damages, prejudgment interest to the extent permitted by law, attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION

**Failure to Pay Overtime Wages - NYLL Article 19 and 12 N.Y.C.R.R. § 142-2.2**

185.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

186.    At all relevant times, Plaintiffs and the members of the were "employees" and Defendant was an "employer" within the meaning of NYLL Articles 6 and 19.

187.    Defendant violated 12 N.Y.C.R.R. § 142-2.2 by failing to pay Plaintiffs and the Class overtime compensation at one and one-half (1.5) times their regular rate of pay for all hours worked in excess of forty (40) per workweek.

188.    Defendant's violations included, without limitation, failure to pay for all compensable hours, failure to pay for off-the-clock work, manipulation or editing of time records, failure to pay for interrupted meal breaks, failure to pay for late closing work, and failure to include non-discretionary commissions in the regular rate.

189.    Defendant's violations of the NYLL were willful.

190.    Plaintiffs and the Class are entitled to recover unpaid overtime compensation, liquidated damages equal to one hundred percent (100%) of unpaid overtime, prejudgment interest, attorneys' fees, and costs pursuant to NYLL §§ 198 and 663.

### THIRD CAUSE OF ACTION

**Unpaid Wages, Unlawful Deductions and Kickbacks - NYLL Article 6, §§ 191, 193, and 198**

191.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

192.    Defendant failed to pay Plaintiffs and the Class all wages earned by them, including straight-time wages for off-the-clock work, interrupted meal breaks, closing work, training work, and work omitted from or edited out of Defendant's timekeeping records.

193.    Defendant made unlawful deductions from wages and required unlawful kickbacks by requiring or pressuring employees to pay customer-account balances, customer charges, unauthorized account additions, or business expenses out of pocket for Defendant's benefit.

194.    Defendant further violated Article 6 of the NYLL by failing to pay earned commissions, changing commission calculations without clear notice, withholding commissions, and failing to provide a clear commission accounting.

195.    Plaintiffs and the Class are entitled to recover unpaid wages, unlawfully deducted amounts, unreimbursed kickbacks, liquidated damages, prejudgment interest, attorneys' fees, and costs pursuant to NYLL § 198.

### FOURTH CAUSE OF ACTION

**Spread of Hours Violations Under 12 NYCRR § 142-2.4**

196.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

197.    Plaintiffs and the Class worked workdays in which the interval between the beginning and end of the workday exceeded ten (10) hours.

198. Defendant failed to pay Plaintiffs and the class one (1) additional hour of pay at the applicable minimum wage rate for each day in which their spread of hours exceeded ten (10) hours.

199. Plaintiffs and the class are entitled to recover unpaid spread-of-hours pay, liquidated damages, prejudgment interest, attorneys' fees, and costs pursuant to NYLL §§ 198 and 663.

## FIFTH CAUSE OF ACTION

### Uniform Maintenance Pay - NYLL and 12 N.Y.C.R.R. § 142-2.5

200. Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

201. Defendant required Plaintiffs and the class to wear uniforms or uniform-like clothing for Defendant's benefit, including branded Metro by T-Mobile shirts and required clothing of specified colors.

202. Defendant failed to launder the required uniforms, failed to provide laundering services, failed to provide sufficient replacement uniforms, failed to reimburse uniform-related expenses, and failed to pay required uniform-maintenance allowances.

203. Plaintiffs and the class paid out of pocket for uniform-related clothing and laundering expenses.

204. Plaintiffs and the class are entitled to recover unpaid uniform-maintenance allowances, unreimbursed expenses, liquidated damages, prejudgment interest, attorneys' fees, and costs.

## SIXTH CAUSE OF ACTION

### Misappropriation of Gratuities - NYLL § 196-d

205.   Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

206.   Customers gave Plaintiff Camacho and members of the class cash tips and gratuities in recognition of services rendered.

207.   Defendant, through managers and agents, demanded or required that hourly retail employees scan customer cash tips into the point-of-sale system as if they were accessory sales and deposit the cash tips into the register.

208.   Defendant retained such tips for the benefit of the company in violation of NYLL § 196-d.

209.   Plaintiffs and the class are entitled to recover all retained gratuities, liquidated damages, prejudgment interest, attorneys' fees, and costs pursuant to NYLL §§ 196-d and 198.

## SEVENTH CAUSE OF ACTION

### Failure to Provide Wage Notice - NYLL § 195(1)

210.   Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

211.   Defendant failed to provide Plaintiffs and the Class with written wage notices at the time of hire and, where applicable, rehire, that complied with NYLL § 195(1).

212.   Defendant's wage notices, to the extent any were provided, failed to accurately identify all rates of pay, overtime rates, allowances, regular payday, commission terms, and other information required by NYLL § 195(1).

213.    Plaintiffs and the Class are entitled to recover statutory damages of fifty dollars ($50) per workday up to a maximum of five thousand dollars ($5,000) per employee, plus attorneys' fees and costs, pursuant to NYLL § 198(1-b).

## EIGHTH CAUSE OF ACTION

### Failure to Provide Accurate Wage Statements - NYLL § 195(3)

214.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

215.    Defendant failed to provide Plaintiffs and the Class with accurate wage statements with each payment of wages in violation of NYLL § 195(3).

216.    Defendant's wage statements failed to accurately list all hours worked, overtime hours worked, regular rates of pay, overtime rates of pay, regular rates including non-discretionary commissions, allowances, deductions, commission calculations, spread-of-hours pay, uniform-maintenance pay, and all wages earned.

217.    Plaintiffs and the Class are entitled to recover statutory damages of two hundred fifty dollars ($250) per workday up to a maximum of five thousand dollars ($5,000) per employee, plus attorneys' fees and costs, pursuant to NYLL § 198(1-d).

## NINTH CAUSE OF ACTION

### Late Payment of Wages to Manual Workers - NYLL §§ 191 and 198

### (On Behalf of Plaintiffs Vivar and Valcourt and the Manual Worker Subclass)

218.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

219.    Plaintiffs and the class were manual workers within the meaning of NYLL § 190(4) because they spent more than twenty-five percent (25%) of their working time performing physical labor.

220.    Defendant was required to pay Plaintiffs and the class weekly pursuant to NYLL § 191(1)(a).

221.    Defendant paid Plaintiffs and the class bi-weekly or otherwise later than weekly.

222.    Plaintiffs and the class are entitled to recover liquidated damages, prejudgment interest, attorneys' fees, and costs pursuant to NYLL § 198.

## TENTH CAUSE OF ACTION

### Retaliation - NYLL § 215

### (On Behalf of Plaintiffs Camacho and Vivar Individually)

223.    Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

224.    Plaintiffs Camacho and Vivar engaged in protected activity under NYLL § 215 by complaining about Defendant's unlawful wage practices, including missing wages, unpaid overtime, time edits, unpaid commissions, customer-account payments, tip retention, and related wage violations.

225.    Defendant knew of Plaintiffs Camacho's and Vivar's protected activity.

226.    Defendant retaliated against Plaintiff Camacho by reducing her hours, changing her schedule, falsely accusing her of theft and misconduct, denying sick time, refusing to investigate her complaints, contesting her unemployment claim, and terminating her employment.

227. Defendant retaliated against Plaintiff Vivar by refusing to correct wage violations, reducing his hours, threatening his employment, continuing to require unpaid overtime and off-the-clock work, and making his working conditions intolerable, causing his resignation.

228. Plaintiffs Camacho and Vivar are entitled to all relief available under NYLL § 215, including reinstatement or front pay, lost compensation, liquidated damages of up to twenty thousand dollars ($20,000), compensatory damages, punitive damages, prejudgment interest, attorneys' fees, and costs.

## ELEVENTH CAUSE OF ACTION

### Denial of Safe and Sick Time - N.Y.C. Admin. Code §§ 20-911 et seq.

### (On Behalf of Plaintiff Camacho Individually)

229. Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

230. Plaintiff Camacho was entitled to accrue and use safe and sick time under ESSTA.

231. Defendant violated ESSTA by imposing an unlawful waiting period, by blocking or denying Plaintiff Camacho's use of accrued safe and sick time on October 13 and October 20, 2025, and by failing to pay Plaintiff Camacho for accrued safe and sick time she was entitled to use.

232. Plaintiff Camacho is entitled to all relief available under ESSTA, including five hundred dollars ($500) for each instance of denied safe or sick time, payment for the safe and sick time unlawfully denied, compensatory damages, equitable relief, attorneys' fees, and costs.

**TWELFTH CAUSE OF ACTION**

**Retaliation - N.Y.C. Admin. Code § 20-918**

**(On Behalf of Plaintiff Camacho Individually)**

233.   Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

234.   Plaintiff Camacho exercised rights protected by ESSTA by requesting and seeking to use accrued safe and sick time and by complaining about Defendant's denial of safe and sick time.

235.   Defendant retaliated against Plaintiff Camacho for exercising those rights, including by reducing her work hours, changing her schedule, falsely accusing her of misconduct, and terminating her employment.

236.   Plaintiff Camacho is entitled to all relief available under ESSTA, including back pay, front pay, compensatory and punitive damages, equitable relief, attorneys' fees, and costs.

**THIRTEENTH CAUSE OF ACTION**

**Fair Workweek Law Violations - N.Y.C. Admin. Code §§ 20-1201 et seq.**

**(On Behalf of Plaintiffs and the Fair Workweek Subclass)**

237.   Plaintiffs repeat and reallege each and every allegation set forth above as though fully set forth herein.

238.   Defendant is a "retail employer" within the meaning of N.Y.C. Admin. Code § 20-1201.

239.   Defendant violated the New York City Fair Workweek Law by changing work schedules without required advance written notice, by requiring on-call shifts, by adding, cancelling, reducing, or changing shifts without written consent, and by failing to maintain and provide legally compliant scheduling records.

240.     Plaintiffs and the Fair Workweek Subclass are entitled to all remedies available under the Fair Workweek Law, including compensatory damages, statutory damages, civil penalties as applicable, equitable relief, attorneys' fees, and costs pursuant to N.Y.C. Admin. Code § 20-1211.

**PRAYER FOR RELIEF**

a.     WHEREFORE, Plaintiffs, individually and on behalf of the FLSA Collective, and the putative class, respectfully request that this Court enter judgment in their favor and against Defendant, granting the following relief:

b.     Designation of this action as a collective action pursuant to 29 U.S.C. § 216(b) and prompt issuance of notice to the FLSA Collective;

c.     Certification of the New York Class and subclasses pursuant to Federal Rule of Civil Procedure 23;

d.     Appointment of Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

e.     A declaration that Defendant's conduct violated the FLSA, the NYLL, ESSTA, and the New York City Fair Workweek Law;

f.     An award of unpaid wages, including unpaid overtime, unpaid straight-time wages, unpaid off-the-clock wages, unpaid commissions, unpaid spread-of-hours pay, and unpaid uniform-maintenance pay;

g.     An award of unpaid wages and liquidated damages arising from Defendant's late payment of wages to manual workers;

h.     An award of all amounts unlawfully deducted, retained, kicked back, or required to be paid by Plaintiffs and the classes for Defendant's benefit;

i.    An award of all gratuities unlawfully retained by Defendant;

j.    An award of liquidated damages under the FLSA equal to the unpaid overtime owed;

k.    An award of liquidated damages under the NYLL in an amount equal to one hundred percent (100%) of unpaid wages;

l.    An award of statutory damages under NYLL §§ 198(1-b) and 198(1-d);

m.    An award of liquidated damages of up to twenty thousand dollars ($20,000) per affected plaintiff under NYLL § 215, plus reinstatement or front pay, lost compensation, compensatory damages, punitive damages, and other relief available for retaliation;

n.    An award of damages under ESSTA, including five hundred dollars ($500) for each denied use of safe or sick time and all damages available for retaliation;

o.    An award of damages and statutory remedies under the New York City Fair Workweek Law;

p.    Pre-judgment and post-judgment interest as provided by law;

q.    Reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b), NYLL §§ 198 and 663, N.Y.C. Admin. Code § 20-924, and N.Y.C. Admin. Code § 20-1211;

r.    Equitable and injunctive relief requiring Defendant to comply with the FLSA, NYLL, ESSTA, and Fair Workweek Law;

s.    Leave to amend the Complaint to identify additional class representatives, subclasses, responsible entities, or responsible individuals if discovery reveals additional proper parties or claims;

t.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


Dated: July 16, 2026
      Jersey City, NJ


By: _____
    Mohammed Gangat, Esq.
    220 9th Street, 2nd Floor, Suite 2049
    Jersey City, NJ 07302
    mgangat@gangatllc.com
    833-729-3247
    *Attorneys for Plaintiffs*